UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MARYSE VOLTAIRE,

                            Plaintiff,

            -against-                                    **MEMORANDUM AND ORDER**

HOME SERVICES SYSTEMS, INC.,                             09-CV-5668 (SLT)(JO)
H.A.N.A.C. INC.,

                            Defendants.
-------------------------------------------------------------x
**TOWNES, United States District Judge:**

        In November 2009, plaintiff Maryse Voltaire, a Licensed Practical Nurse formerly

employed by defendant Home Services Systems, Inc. ("HSS"), commenced this action in the

Supreme Court of the State of New York, Queens County, alleging that HSS and its corporate

parent, H.A.N.A.C., Inc. ("HANAC"), denied her the 12-week leave of absence to which she was

entitled under the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 *et seq.* ("FMLA"),

and terminated her in retaliation for exercising her FMLA rights and on account of her disability,

in violation the New York State Human Rights Law ("NYSHRL") and New York City Human

Rights Law ("NYCHRL"). In December 2009, HSS and HANAC (collectively, "Defendants")

removed the action to this Court. Defendants now move for summary judgment, principally

arguing that plaintiff cannot establish that the Defendants interfered with her rights under the

FMLA and cannot prove that Defendants' reason for discharging plaintiff was a pretext for

unlawful retaliation or discrimination. For the reasons set forth below, Defendants' motion for

summary judgment is denied in its entirety.

## BACKGROUND

Except as otherwise noted, the parties agree on the following facts.  HSS is a non-profit home healthcare provider which provides home attendants to clients in New York City (Defendants' Statement of Undisputed Material Facts ["Def. 56.1 Statement"] at ¶¶ 1, 7; Plaintiff's Response to Defendants' Local Rule 56 Statement ["Pl. 56.1 Statement"] at ¶¶ 1, 7). At all times relevant to this action, HSS employed Registered Nurses ("RNs") to supervise and evaluate the home attendants (Def. 56.1 Statement at ¶¶ 6-7; Pl. 56.1 Statement at ¶¶ 6-7).  These RNs made "Assessment Visits" to evaluate new clients and, at six month intervals thereafter, to update the client's "Plan of Care" (Def. 56.1 Statement at ¶ 8; Pl. 56.1 Statement at ¶ 8).  The RNs also made "Supervisory Visits" every three months in order to ensure that the home attendant was following the "Plan of Care" and otherwise performing adequately, and to respond to client complaints and reports of incidents or accidents involving the clients and/or home attendants (Def. 56.1 Statement at ¶¶ 7, 9; Pl. 56.1 Statement at ¶¶ 7, 9).

HSS provides these services pursuant to contracts with the New York City Human Resources Administration ("HRA"), and obtains much, if not all, of its funding from this source (Def. 56.1 Statement at ¶¶ 1, 14; Pl. 56.1 Statement at ¶¶ 1, 14).  To maintain this funding, HSS must pass periodic "HRA Audits" (Def. 56.1 Statement at ¶ 14; Pl. 56.1 Statement at ¶ 14). These audits, which take place at HSS's offices, involve the review of randomly selected client charts to determine, among other things, whether client visits are performed in a timely manner (Def. 56.1 Statement at ¶ 15; Pl. 56.1 Statement at ¶ 15).

HSS failed audits in 2006 and 2007, at least partly because of a failure to comply with HRA guidelines relating to the timeliness of Supervisory and Assessment Visits (Def. 56.1

2

Statement at ¶ 16; Pl. 56.1 Statement at ¶ 16).  After HSS failed the 2007 audit, HSS's Director

of Patient Services, Marcia Morgan-Parker, hired some Licensed Practical Nurses ("LPNs") to

assist the RNs (Def. 56.1 Statement at ¶¶ 6, 17; Pl. 56.1 Statement at ¶¶ 6, 17).  The LPNs could

not perform the initial assessment of a new client, but could perform Supervisory Visits and

respond to client complaints or reports of incidents and accidents (Def. 56.1 Statement at ¶¶ 10,

13; Pl. 56.1 Statement at ¶¶ 10, 13).

        Plaintiff was one of the LPNs hired by HSS (Def. 56.1 Statement at ¶ 11; Pl. 56.1

Statement at ¶ 11).  Although Defendants represent that the LPN position "did not exist at HSS

prior to Plaintiff's hire" (Def. 56.1 Statement at ¶ 11), the citations provided in support of this

proposition do not substantiate it.  Rather, documents provided by the parties indicate that an

LPN named Hugh Greenidge was hired by Morgan-Parker on June 26, 2007 – about eight

months before plaintiff  (Deposition of Hugh Greenidge ["Greenidge Dep."], attached as Ex. D to

the Declaration of Mathew Paulose, Jr., Esq. [the "Paulose Declaration"], at 9-10; Deposition of

Maryse Voltaire ["Voltaire Dep."], attached as Ex. A to Paulose Declaration, at 39).  Plaintiff

was hired in February 2008 (Voltaire Dep. at 20).  Though Greenidge worked in Queens and

plaintiff worked in Brooklyn, both plaintiff and Greenidge were hired as Field Nurses, who were

assigned to conduct Supervisory Visits (Greenidge Dep. at 10; Voltaire Dep. at 22).

        Shortly after plaintiff began, HSS hired a third LPN, Magalie Israel (Voltaire Dep. at 39;

Deposition of Magalie Israel ["Israel Dep."], attached as Ex. E to Paulose Declaration, at 7).

However, Israel was hired to deal with accident and incident reports, rather than to assist with the

Supervisory Visits (Israel Dep. at 18; Voltaire Dep. at 38).  According to plaintiff, she, Greenidge

and Israel were the only three LPNs employed by HSS (Voltaire Dep. at 37).

Although Greenidge could not recall interviewing with anyone other than Morgan-Parker (Greenidge Dep. at 9), both plaintiff and Israel testified that they were interviewed not only by Morgan-Parker, but also by Callie Tserpelis and Zacharine ("Zach") Pappas (Voltaire Dep. at 20; Israel Dep. at 9-11).  Tserpelis has been the Program Director at HSS since sometime in 2007 (Deposition of Callie Tserpelis ["Tserpelis Dep."], attached as Ex. B to Paulose Declaration, at 15, 19).  Pappas is the Associate Executive of Director of HANAC which, according to Tserpelis, has "administrative responsibility" over HSS (Tserpelis Dep. at 32).

Despite the fact that Pappas works for HANAC, not HSS, Pappas is Tserpelis's immediate supervisor (Def. 56.1 Statement at ¶ 31; Pl. 56.1 Statement at ¶ 31).  Each month, Tserpelis sends Pappas a report, discussing the performance of HSS's departments (*id.*).  Although Tserpelis claims that HSS makes its own personnel decisions (Tserpelis Dep. at 70), she e-mailed Pappas before extending an offer to plaintiff, stating:

> I would like to hire Maryse Voltaire (LPN) for Brooklyn cases to do assessments, handling of complaints etc. in Brooklyn as we discussed.  I would offer her $45,000.

Paulose Declaration, Ex. S.  At her deposition, Tserpelis gave varying explanations of the e-mail.  Tserpelis testified that she was only "verifying to make sure we have the money and line in the budget for the position" (Tserpelis Dep. at 70), but conceded that she had to inform Pappas of all her hires and "normally . . . put it in writing so . . . she can say yes or no or whatever" (Tserpelis Dep. at 70-71).  In addition, Tserpelis testified that while she, herself, had interviewed with Pappas and Morgan-Parker prior to being hired, it was Pappas who offered her the position (*id.* at 89).

4

When she was hired at HSS, plaintiff received a copy of an employee handbook (Def. 56.1 Statement at ¶ 5; Pl. 56.1 Statement at ¶ 5). This handbook contained, *inter alia*, a description of HSS's FMLA policy, laying out the rights and responsibilities of employees under the Act (Def. 56.1 Statement at ¶ 4; Pl. 56.1 Statement at ¶ 4). Although the parties have not provided a copy of the handbook in effect at the time plaintiff was hired, or adduced any evidence to indicate that employees were provided with updated versions of the handbook, Defendants have provided the 2009 version of HSS's Employee Manual (Ex. A to Affidavit of Diane Windholz in Support of Defendants' Motion for Summary Judgment ["Windholz Affidavit"]).

In November 2008, HSS failed the HRA audit yet again for failure to comply with HRA guidelines pertaining to the timeliness of Supervisory and Assessment Visits (Def. 56.1 Statement at ¶ 16; Pl. 56.1 Statement at ¶ 16; Ex. B to Windholz Affidavit at 606-08). Shortly thereafter, in early 2009, Morgan-Parker resigned (Def. 56.1 Statement at ¶ 12; Pl. 56.1 Statement at ¶ 12). Although Tserpelis, unlike Morgan-Parker, was not an RN, Tserpelis was left to supervise the nurses until another Director of Patient Services ("DPS") could be hired (Tserpelis Dep. at 5, 77).

Beginning in early 2009, Tserpelis instituted some changes in the nursing department. Although plaintiff objects to characterizing these changes as "[r]estructuring of personnel" ((Pl. 56.1 Statement at ¶ 19), plaintiff admits that some of the changes involved personnel. For example, in February 2009, Greenidge, the LPN who had been making Supervisory Visits in Queens, was reassigned to conducting all "inservice" training sessions: continuing-education-type meetings at which the home attendants were updated on "a variety of matters on which [they

are] expected to have knowledge" (Def. 56.1 Statement at ¶¶ 22-24; Pl. 56.1 Statement at ¶¶ 22-24).  Following this reassignment, plaintiff was the only LPN at HSS still assigned to conduct field visits to client's homes (Def. 56.1 Statement at ¶ 27; Pl. 56.1 Statement at ¶ 27).  In addition, HSS hired two "nursing clerks" to review HSS's charts for compliance with HRA guidelines and an "Independent Nursing Consultant," who visited HSS twice each week to analyze deficiencies in the charts and ensure that the nursing clerks were reviewing HSS's charts properly (Def. 56.1 Statement at ¶¶ 29-30; Pl. 56.1 Statement at ¶¶ 29-30).

In her monthly reports to Pappas, Tserpelis kept Pappas apprised of her plans for restructuring the nursing department.  In her January 2009 report, Tserpelis informed Pappas that she intended to replace Israel with an RN, stating:

> The assistant to the DPS should be a Registered Nurse (Head Nurse) who can step in to the DPS role when necessary.  Currently there is an LPN in that position who will be replaced as the job requirements for the position are being changed with the restructuring of the department.

(Paulose Declaration, Ex. H, at Bates Stamp D-188).  In her February 2009 report, Tserpelis again discussed the need to hire a Head Nurse "with the ability to step in to the DPS position as necessary," and noted that "the employee in this position is a Quality Improvement Nurse which is only a small part of the requirements of the position" (*id.*, at Bates Stamp D-192: Windholz Affidavit, Ex. E).  In that same report, Tserpelis noted that two nurses "must be replaced," that an offer had been extended to another nurse, and that three additional nurses had been interviewed who were "viable candidates . . . but . . . not available for Brooklyn . . . where our need is" (*id.*).  In her March 2009 report, Tserpelis stated that she intended to fire another nurse, stating, "One of the nurses will be terminated as her files are completely non-compliant and she is working at a

6

facility which is attributing [*sic*] to the issue" (Paulose Declaration, Ex. H, at Bates Stamp D-194; Windholz Affidavit, Ex. G).

In her April 2009 report, Tserpelis discussed her plans for restructuring the nursing department in some detail:

> Working with the nursing staff during the last 4 months . . . has allowed me the opportunity to evaluate the staff's ability to perform their jobs and the staffing needs of the department. The average number of cases for our nurses is 185 and based on the amount of time it takes to visit a client and complete all necessary paperwork within the required timelines, their caseloads will be reduced to 160 per nurse. To accommodate this, the budget has been evaluated and a decision has been made to hire 2 additional field nurses. Offers have been extended and have been accepted. The reorganization of the caseloads will be completed by the end of May.

(Paulose Declaration, Ex. H, at Bates Stamp D-196; Windholz Affidavit, Ex. H, at 1). That same report indicated that the "nursing visits for last month were 95% on time" (*id.*), and that all of the client files reviewed during an audit on May 9 and 10, 2009, had been "100% accurate" (Paulose Declaration, Ex. H, at Bates Stamp D-197; Windholz Affidavit, Ex. H, at 2). In contrast to the reports for the preceding months, there was no mention of any intention, or need, to terminate any employees.

The May 2009 report noted that two RNs had been hired to work in Manhattan and Queens, but that one of the RNs had already resigned to take a better-paying position (Paulose Declaration, Ex. H, at Bates Stamp D-198). The report stated that HSS was "recruiting for a replacement to this . . . nurse as well as for a Registered Nurse in Brooklyn" (*id*). The report also noted that "[t]he in-service trainings and orientations for the home attendants [were] being revamped," and that Greenidge was conducting the "in-services and orientations" (*id.*). The

7

report mentioned that an Assistant Personnel Specialist Supervisor had been demoted and that a bookkeeper was hired (*id.*), but made no mention of any other planned personnel changes.

The June 2009 report noted that HSS was recruiting for a field nurse in Brooklyn (Paulose Declaration, Ex. H, at Bates Stamp D-200). That same report indicated that "reports from the independent nurse consultant" showed that the "compliance rate with the auditing of the client files" had dipped to 85% (*id.*). The report specifically stated that the new bookkeeper was "doing well" (*id.*), but made no mention of other personnel changes.

### *Plaintiff's Illness*

Although the following account of plaintiff's illness is drawn primarily from plaintiff's deposition testimony, there does not appear to be a substantial issue relating to the nature or duration of plaintiff's illness. Notably, Defendants do not address upon this motion the issue of whether plaintiff's condition rose to the level of a disability for purposes of the relevant statutes.

On Friday, May 22, 2009 – just prior to the start of the Memorial Day weekend – plaintiff awoke with a fever (Voltaire Dep. at 85). Plaintiff drove herself to a hospital near her Valley Stream home, where she was diagnosed with "walking pneumonia" (*id.* at 85-86). She was treated with antibiotics, then released (*id.* at 86-87).

At some point that morning, prior to her release from the hospital, plaintiff called HSS's offices to tell them that she was sick (*id.* at 87-88; Def. 56.1 Statement at ¶ 16; Pl. 56.1 Statement at ¶ 16). It is unclear to whom plaintiff spoke at HSS. Voltaire recalled that, even though she called during business hours, she spoke to an answering service (Voltaire Dep. at 88). However, Tserpelis testified that she herself spoke with plaintiff that day, and specifically recalled that

plaintiff's voice sounded "groggy" (Tserpelis Dep. at 104). In any event, both plaintiff and

Tserpelis testified that plaintiff said only that she would be unable to work that weekend, when

she was on call (Voltaire Dep. at 87-88; Tserpelis Dep. at 104). It is unclear whether plaintiff

had received a diagnosis at the time she called in sick but, even if she had, there is no evidence

suggesting that she divulged it during the May 22 call or otherwise indicated that she would be

out the following week.

On the night of Saturday, May 23, 2009, plaintiff's condition took a turn for the worse.

Plaintiff claims that she experienced such difficulty breathing that night that she asked her

relatives to call "911" (Voltaire Dep. 89). Plaintiff was taken by ambulance to the hospital,

where she was placed in either the Intensive Care Unit ("ICU") or the Critical Care Unit

("CCU") (*id.* at 90-91). According to plaintiff, one of her lungs collapsed and she developed

sepsis while in the ICU or CCU, so she remained there "for about a week [or a] week and a half."

(*id.* at 91, 93).

On or about Tuesday, May 26, 2009, one of plaintiff's two daughters, Jessica Denis,

called Tserpelis to inform her that plaintiff was in the hospital (Deposition of Jessica Denis

["Denis Dep."], attached as Ex. F to Paulose Declaration, at 11-12; Tserpelis Dep. at 92). It is

unclear whether Denis said only that plaintiff was "in the hospital" (Tserpelis Dep. at 92, 93, 95),

or whether Denis told Tserpelis that plaintiff had been in the Emergency Room the entire

weekend with pneumonia (*id.* at 114; Paulose Declaration, Ex. J, at 126; Denis Dep. at 16).

Although Denis made no specific requests during the conversation (Tserpelis Dep. at 95-96), and

may even have told Tserpelis that plaintiff "would be out for only a couple of days" (Denis Dep.

at 15-16), Tserpelis realized that plaintiff was ill enough to require hospitalization (Tserpelis Dep. at 94-95).

According to Gail Carmichael, who served as the Human Resources Director for both HSS and HANAC, Tserpelis informed her of plaintiff's hospitalization shortly thereafter. At her deposition, Carmichael recalled that "around Memorial Day weekend," Tserpelis called to tell Carmichael that plaintiff was "in ICU or something" (Deposition of Gail Carmichael ["Carmichael Dep."], attached as Ex. C to Paulose Declaration, at 19). It is unclear whether Tserpelis told Carmichael that she felt plaintiff would be out for "for a length of time," or whether Carmichael assumed it because plaintiff was in the ICU (Carmichael Dep. at 19-20). However, at her deposition, Carmichael testified that she believed that plaintiff might be eligible for FMLA leave sometime "about Memorial Day" (*id.* at 19).

Carmichael could not recall precisely what actions she took upon determining that plaintiff might be eligible for leave. Rather, Carmichael could only testify that her usual custom and practice was first to request a job description for the employee in question, which was necessary to enable a doctor to determine if the employee was disabled (*id.* at 21-22). Carmichael would then ask her assistant to create a "package," which included both disability forms and a notice relating to FMLA leave (*id.* at 21-22). Although Carcmichael herself would review the package and "put it in the mail," Carmichael did not keep a record of these mailings (*id.* at 23).

There is some evidence that a package of the sort described above was prepared for plaintiff on or about June 1, 2009. First, there is an e-mail attached as Exhibit O to the Windholz Affidavit," which indicates that at noon on June 1, 2009, Carmichael asked Teserpelis for "a

10

copy of a RN job description to send to Maryse Voltaire's physician for our ADA requirements for FMLA and DBL" (*id.* at D-134). Second, there is an e-mail from Tserpelis to Carmichael, sent later on June 1, 2009, which responds to Carmichael request by attaching a three-page job description (*id.* at D-135-38). Third, both parties have submitted a U.S. Department of Labor form entitled, "Notice of Eligibility and Rights & Responsibilities (Family and Medical Leave Act)," addressed to plaintiff from Carmichael and dated June 1, 2009 (Ex. N to Windholz Affidavit; Ex. P. To Paulose Dec.). That form (the "FMLA Notice") advised plaintiff that she was eligible for FMLA leave, but enclosed a "certification form" and stated that FMLA leave "may be denied" unless the form was returned by June 16, 2009 (*id.*).

However, there is also some evidence casting doubt on whether the FMLA Notice was actually mailed. First, although Carmichael testified that it was her custom and practice to include the FMLA Notice in the same package with the disability forms, plaintiff's papers include a cover letter from Carmichael to plaintiff dated June 1, 2009, which refers solely to the disability forms (Ex. L to Paulose Dec.). The disability form, entitled Notice of Proof of Claim for Disability Benefits (the "Proof of Claim"), was completed by plaintiff and by plaintiff's health care provider on June 22, 2009 (Ex. P to Windholz Affidavit). However, even though the FMLA Notice required much the same information as the Proof of Claim (compare Ex. N to Windholz Affidavit to Ex. P to Windholz Affidavit), it is undisputed that plaintiff never returned the FMLA Notice.

Carmichael testified that it was her practice to call the employee if the certification form was not returned within the time specified, but that she could not recall whether she had done so in plaintiff's case (Carmichael Dep. at 24). Carmichael also testified that she probably would have

11

kept a record of the calls she placed to plaintiff on the front of a folder, but that she could not find that folder (*id.* at 25).

In addition to this documentary evidence, plaintiff and her daughter both testified that they never received the FMLA Notice. Denis, an attorney who had become familiar with the FMLA during her work as a claims analyst (Denis Dep. at 36-38), testified that she expressly requested "FMLA leave and disability leave" during a conversation with Tserpelis on or about June 8, 2009 (*id.* at 18). Tserpelis referred Denis to Carmichael (Tserpelis Dep. at 122; Denis Dep. at 19). According to Denis, when Carmichael called her that afternoon or the next day, Denis again asked for "FMLA forms and disability forms" (Denis Dep. at 23). Denis recalled confirming the address to which the forms should be sent, and that Carmichael indicated that she would send out the forms (*id.* at 24).

Denis, who lived with her mother, testified that she collected but, with the exception of some bills, did not open the mail addressed to plaintiff that arrived during plaintiff's hospitalization (Denis Dep. at 85). Rather, a few days after plaintiff's release from the hospital on June 12, 2009, Denis and plaintiff opened the mail together (*id.* at 111). Both Denis and plaintiff recalled receiving the Proof of Claim, which was completed later that month (*id.* at 107; Voltaire Dep. at 123). However, both Denis and plaintiff testified that they never received a copy of the FMLA Notice (Denis Dep. at 82-83; Voltaire Dep. at 145-46).

***Plaintiff's Termination***

At some point during June 2009, Tserpelis learned more about the seriousness of plaintiff's medical condition. The parties agree that sometime during the second week of June, Tserpelis had a telephone conversation with Denis, who revealed that plaintiff was still in the

hospital. However, the parties offer different accounts of what occurred. Tserpelis testified that she left a voice mail message for plaintiff on June 8, 2009, inquiring how plaintiff was doing. According to Tserpelis, Denis returned the call on June 10 and reported that her mother "was better [but] still in the hospital" (Tserpelis Dep. at 122). Denis then inquired about whether plaintiff would continue to be paid, prompting Tserpelis to refer her to Carmichael (*id.*). Although Tserpelis left another voice mail message for plaintiff and Denis at some point thereafter (*id.* at 125), there is nothing in Tserpelis's testimony or notes to suggest that she had any subsequent conversation with Denis.

In contrast, Denis testified that she initiated the contact by calling and leaving a message for Tserpelis on June 8, 2009, and that Tserpelis subsequently called her back (Denis Dep. at 14-15, 17-18). In the ensuing conversation, Denis said that plaintiff would need more time off than she had initially expected and "requested FMLA leave and disability leave" (*id.* at 15, 18). According to Denis, Tserpelis advised her that plaintiff "had 18 or 19 vacation or sick days, and that if she needed all that time, she [could] . . . take it and she would be paid" (*id.* at 18). Tserpelis also said "let's have her use the 18 or 19 days first, and then if she needs more time, we'll come back to the FMLA or disability leave" (*id.*).

Denis further testified that when she asked Tserpelis to verify how many days plaintiff had off, Tserpelis said she would arrange to have Carmichael call (*id.* at 19). However, later that same day, about half an hour after Carmichael called, Tserpelis called Denis again (*id.* at 25-26). According to Denis:

> [Tserpelis] said your mom is great, she has all these days because she never takes vacation. And she said don't worry, your mom's job is safe.

13

*     *     *

And she said we're rooting for her, we all want her to do her best.

(*Id.* at 25-26).

Denis recalled yet one more conversation with Tserpelis, which allegedly took place on or about June 11, 2009 – the day before plaintiff was released from the hospital (*id.* at 31). Denis testified:

> Callie [Tserpelis] called one more time just to say hi, I'm checking in, see how things are going. Do you have an idea when your mom's getting back[?]

(*Id.* at 30). When Denis told her that things were "really not looking good" and that she was "not really sure," Tserpelis told Denis to tell plaintiff to "take all the time she needs" (*id.* at 31). However, Denis perceived that this conversation was more businesslike, in that Tserpelis "got off the phone really quick" and "wasn't empathetic" (*id.* at 116).

Although Tserpelis testified that she was informed by one of the RNs that plaintiff was still in the hospital during the second week of June 2009 (Tserpelis Dep. at 96), Tserpelis was apparently not aware that plaintiff had suffered a collapsed lung until Friday, June 26, 2009, when she was informed of this fact by Israel (*id.* at 127). Even though Israel also may have told Tserpelis that plaintiff was "better now," Tserpelis testified that she was "shocked to hear that [plaintiff] had a collapsed lung" (*id.*). She further testified that she considered it to be "important" information because she had not previously realized that plaintiff was "really that sick" (*id.* at 128), and that neither she nor Carmichael "knew what was going on with [plaintiff]" prior to that point (*id.*).

14

Tserpelis then contacted Carmichael who, either later that day or the next business day, drafted a letter terminating plaintiff (*id.* at 130, 153-54). That letter, signed by Tserpelis and dated June 29, 2009, informed plaintiff that her services would "no longer be needed" effective June 30, 2009 (Paulose Declaration, Ex. I; Windholz Affidavit, Ex. L). The letter stated that HSS had been "undergoing a reorganization" both before and after Tserpelis assumed the role of "Director," and that HSS had hired the LPNs as part of that reorganization, "to expedite nurse visits to clients in Brooklyn" (*id.*). However, the letter further asserted that "[i]n reviewing the effectiveness of this change, we have decided that though your service has been above reproach and professional in every way, the overall hoped for effect was not achieved" (*id.*). The letter did not identify specifically who had decided to terminate plaintiff's employment or precisely when that decision was reached.

At her deposition, Tserpelis testified that she alone had made the decision to terminate plaintiff in mid-April 2009 (Tserpelis Dep. at 155-56, 159). Tserpelis claimed:

> [I]t came pretty clear to me sometime in April that the LPN
> position, in evaluating the charts and seeing what the issues were,
> the LPN position was not effective in helping us get the visits done
> in a timely manner.
>
>          \*      \*      \*
>
> I had been auditing the charts – reevaluating the charts, looking at
> all the notes and looking at the issues that we still had as of April,
> and realized a lot of the issues we had in the Brooklyn area were
> with the LPN position not coordinating with the RNs, so the job
> can be done effectively.

(*Id.* at 155, 157). Tserpelis explained that she had not terminated plaintiff immediately because she first needed to readjust the caseloads of the RNs in a way that would alleviate the burden on

Adrienne Williams and Jocelyne Cociffi, the two Brooklyn RNs that plaintiff was assisting (*id.* at 158).

Defendants have produced some documentary evidence to substantiate Tserpelis's claim that she actually made the decision to terminate plaintiff over a month before she announced it. Most notably, Defendants have produced three memoranda. The first, dated February 11, 2009, and addressed to "File," purports to recount a conversation between plaintiff and Tserpelis which allegedly took place following a nurses' staff meeting at which Tserpelis announced that Greenidge, the LPN who had been assigned to assist RNs in Queens, was being "assigned to in-services and orientations" (Windholz Affidavit, Ex. D., at D-202). According to the memo, plaintiff approached Tserpelis after the meeting and asked "how the decision to change the LPN role in Queens . . . would affect her . . . " (*id.*). Tserpelis reportedly responded by telling plaintiff that "her role in assisting Registered Nurses . . . was still being evaluated," but that her "supervisory visits seemed to be repetitive since she was visiting one day and the nurses seem[ed] to be visiting the same clients within a few days of her visit" (*id.*).

The second memo – dated April 13, 2009, and entitled "Proposed Restructuring of Nursing Department" – is addressed not only to "File," but also to Pappas and Carmichael. The memo purports to make three recommendations for personnel changes involving the LPNs: (1) re-assigning Greenidge to conduct orientations and in-service training programs; (2) replacing Israel with a Head Nurse; and (3) eliminating the LPN field positions (Windholz Affidavit, Ex. I). With respect to the latter, the memo opines that "[t]he LPN field nurse position is not effective in ensuring that the nursing visits are completed in a timely manner" and

16

"counterproductive since there was no coordination on the RNs['] part to assign visits to the

LPN" (*id.* at D-203).    The memo also states:

> I discussed this with Maryse, Adrienne and Jocelyn [*sic*] and they
> assured me that the LPN visits were effective.  I showed them
> situations with client visits that proved otherwise.  Since Adrienne
> and Jocelyn [*sic*] were not entering their visits in the system in a
> timely manner, the LPN visits are not completed on time.
> Adrienne and Jocelyn [*sic*] are not able to manage Maryse's
> schedule since they are not able to manage their own.

(*Id.* at D-203-04).

The third memo, dated May 11, 2009, and addressed only to "File," describes Tserpelis's

efforts to readjust the RNs' caseloads in anticipation of eliminating the LPN field nurses.

Specifically, the memo states that "clients have been reassigned to nurses so that [the RNs']

territories are more clustered," with a view to decreasing the caseloads of the two Brooklyn

nurses that plaintiff assisted (Windholz Affidavit, Ex, J, at D-205).  The memo further states,

"Once the cases are stabilized we will eliminate the LPN position."

All three of these memos are on HSS letterhead and were initialed by Tserpelis.

However, at the very end of her deposition, Tserpelis conceded that the first and second of these

memoranda were recreations of the original memoranda, and that she was unsure whether the

third memorandum was a recreation or the original (Tserpelis Dep. at 244-248).  According to

Tserpelis, the computer on which the original documents were drafted "crashed in the summer of

2009" (*id.* at 246).  In October or November of 2009, unable to retrieve copies of the documents,

Tserpelis took her "written notes and . . . recreated the document[s]," then initialed them (*id.* at

246-47).  Tserpelis was able to produce the handwritten notes on which the recreations of the

first two memoranda were allegedly based (Windholz Affidavit, Ex. D, at D-637, and Ex. I, at D-

17

638-39), and testified that these notes were kept in a "restructuring file," which Tserpelis described as "a manila folder with pieces of paper in it" (Tserpelis Dep. at 245). However, Tserpelis did not offer any explanation regarding what happened to the original memoranda.

Aside from these handwritten notes, Defendants have adduced little, if any, evidence to corroborate Tserpelis's claim that she had already decided to terminate plaintiff as of mid-April 2009. Defendants have not introduced any testimonial or documentary evidence from Pappas – not even copies of the original April 13, 2009, memorandum. Carmichael also could not produce a copy of this memo, and could not recall when she first learned that plaintiff's position was going to be eliminated (Carmichael Dep. at 66).

On the other hand, there is evidence contradicting portions of these three memoranda. For example, plaintiff testified that she specifically recalled the nurses' meeting referenced in the February 11, 2009, memorandum, at which changes to Greenidge's position were discussed (Voltaire Dep. at 155-57). However, plaintiff denied having approached Tserpelis after that meeting to express concern about her job or how the changes in Greenidge's position might affect her (*id.* at 155, 159-60). To the contrary, plaintiff recalled that Adrienne Williams, one of the RNs with whom plaintiff worked, took plaintiff to Tserpelis's office that day and insisted that plaintiff continue to assist her (*id.* at 157-59). According to plaintiff's testimony, Tserpelis never said that plaintiff's role was being evaluated (*id.* at 159-60) or that her supervisory visits were redundant (*id.* at 160), but instead reassured Williams that plaintiff would continue to assist her (*id.* at 159-61).

The other RN for whom plaintiff worked, Jocelyne Cociffi, recalled an instance following Greenidge's reassignment in which plaintiff asked Tserpelis what might happen to her job

(Deposition of Jocelyne Cociffi ["Cociffi Dep."], attached as Exhibit G to Paulose Declaration, at 48). Cociffi testified that Tserpelis "told her to wait," or said, "I'm still thinking about it" (*id.*). While Cociffi was unsure exactly what Tserpelis said, she was confident that Tserpelis had not intimated that plaintiff might be fired (*id.* at 48-49).

Plaintiff also testified that, during a nurses' meeting sometime in April 2009, an RN named Jackson asked if there were going to be any layoffs (Voltaire Dep. at 161). According to plaintiff, Tserpelis assured Jackson that no one would be laid off (*id.* at 162). Cociffi, too, recalled Jackson asking Tserpelis, "What's going to happen?" or something to that effect (Cociffi Dep. at 51). Cociffi was uncertain what Tserpelis said in response, but thought Tserpelis said she did not know (*id.* at 51-52).

In this connection, this Court notes that Tserpelis herself testified that she did not verbally inform anyone that plaintiff had been terminated until July 22, 2009. Indeed, Tserpelis testified that she never verbally informed plaintiff of her termination, even when plaintiff called her on June 30, 2009, to say that she needed more time to recuperate but would be back on July 13 (Tserpelis Dep. at 166-67). Tserpelis only decided to inform the staff – including the two nurse with whom plaintiff worked – of plaintiff's termination after a July 22, 2009, conversation in which Cociffi revealed (1) that plaintiff had told her about her termination and (2) that plaintiff thought the termination was due to plaintiff's illness (*id.* at 178-181). According to Tserpelis, no one was ever hired to replace plaintiff, although some of the clients assigned to the RNs for whom she worked were transferred to other nurses (*id.* at 243). Indeed, Tserpelis testified that she wanted to terminate one of the Brooklyn RNs, but was unable to do so because she could not find a replacement (*id.* at 222).

19

***This Action and the Instant Motion***

In November 2009, plaintiff commenced this action by filing a summons and verified complaint in the Supreme Court of the State of New York, Queens County. Plaintiff's complaint alleged four causes of action. First, the complaint alleged that Defendants had violated plaintiff's rights under the FMLA by failing to "provide her with the information and paperwork required to apply for such leave and denied her the right to take a leave of absence up to 12 weeks . . . ." Complaint at ¶ 31. Second, the complaint alleged that Defendants had terminated plaintiff in retaliation for her "attempting to exercise her rights under the FMLA." *Id.* at ¶ 35. The remaining two causes of action alleged that plaintiff had been terminated on account of her disability in violation of both the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-107 *et seq.*

In December 2009, Defendants – jointly represented by the same counsel – removed this action to this Court pursuant to 28 U.S.C. § 1146. In their Notice of Removal, Defendants noted that this Court had federal-question jurisdiction by virtue of the first two causes of action. The complaint was never amended.

Defendants now move for summary judgment on three grounds. First, Defendants seek summary judgment with respect to plaintiff's first cause of action, asserting that plaintiff cannot establish that Defendants interfered with her rights under the FMLA because plaintiff was provided both with notice of her rights under the FMLA and with the requisite forms. Second, Defendants move for summary judgment with respect to the remaining causes of action, arguing that plaintiff cannot establish that Defendants' non-discriminatory reason for terminating plaintiff

20

was a mere pretext for either (1) retaliating against plaintiff for exercising her rights under the FMLA or (2) discriminating against plaintiff on account of her disability.  Third, Defendants seek to dismiss defendant HANAC from the action, on the ground that HANAC was never plaintiff's employer.  These three grounds and plaintiff's response to Defendants' arguments are described in greater detail in the discussion that follows.

***DISCUSSION***

***Standard of Review***

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks omitted).

The moving party bears the burden of showing that there is no genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).  The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted).  Moreover, the disputed facts

21

must be material to the issue in the case, in that they "might affect the outcome of the suit under

the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in

the light most favorable to the party against whom summary judgment is sought and must draw

all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d

Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file,

and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it

appears that the evidence supporting the non-movant's case is so scant that a rational jury could

not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). "If

the evidence [presented by the non-moving party] is merely colorable, or is not significantly

probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.

1998) (internal quotation marks omitted) (alteration in original).

### *The FMLA*

Before addressing Defendants' arguments for summary judgment, this Court must discuss

possible causes of action under the FMLA. The FMLA entitles eligible employees to take up to

12 work weeks of unpaid leave annually for any of several reasons, including a "serious health

condition that makes the employee unable to perform the functions of the position of such

employee." 29 U.S.C. § 2612(a)(1)(D).[1] An employee who takes FMLA leave is "entitled, on

---

[1]A "serious heath condition" is defined to mean "an illness, injury, impairment, or
physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or
residential medical care facility; or (B) continuing treatment by a health care provider." 29
U.S.C. § 2611(11).

return from such leave . . . (A) to be restored by the employer to the position of employment held

by the employee when the leave commenced; or (B) to be restored to an equivalent position

. . . ." *Id.* § 2614(a)(1). An employee is entitled to such reinstatement even if the employee has

been replaced or his or her position has been restructured to accommodate the employee's

absence. 29 C.F.R. § 825.214. However, "[a]n employee has no greater right to reinstatement or

to other benefits and conditions of employment than if the employee had been continuously

employed during the FMLA leave period." 29 C.F.R. § 825.216. For example:

> If an employee is laid off during the course of taking FMLA leave
> and employment is terminated, the employer's responsibility to
> continue FMLA leave, maintain group health plan benefits and
> restore the employee cease at the time the employee is laid off,
> provided the employer has no continuing obligations under a
> collective bargaining agreement or otherwise. An employer would
> have the burden of proving that an employee would have been laid
> off during the FMLA leave period and, therefore, would not be
> entitled to restoration.

*Id.*

     The FMLA specifically provides that "it shall be unlawful for any employer to interfere

with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

FMLA]." 29 U.S.C. § 2615(a)(1). The Act also provides that it is unlawful "for any employer to

discharge or in any other manner discriminate against any individual for opposing any practice

made unlawful by this subchapter," 29 U.S.C. § 2615(a)(2), or "for any person to discharge . . .

any individual because such individual . . . has filed any charge, or has instituted or caused to be

instituted any proceeding, under or related to this subchapter . . . ." 29 U.S.C. § 2615(b). The

Second Circuit recognizes a distinction between claims which allege a violation of § 2615(a)(1) –

so-called "interference" claims – and claims which allege violations of § 2615(a)(2) and (b),

which are called "retaliation" claims. *See Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 175-76 (2d Cir. 2006); *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004).

In *Potenza*, the Second Circuit surveyed the various approaches taken by its sister circuits in analyzing FMLA cases and "noted with some favor" the approach adopted by the Seventh Circuit in *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). *Sista*, 445 F.3d at 176. The Seventh Circuit distinguished between "interference" and "retaliation" claims, finding it "appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation – where the employer's intent is material – but not to assertions of interference – where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right." *Potenza*, 365 F.3d at 168. However, the *Potenza* Court "did not 'decide whether or not to adopt the Seventh Circuit's analysis in its entirety' . . . [but] "determined only that retaliation claims would be governed by *McDonnell Douglas* analysis." *Sista*, 445 F.3d at 176 (quoting *Potenza*, 365 F.3d at 168).

In this case, plaintiff is bringing both an "interference" claim and a "retaliation" claim. Plaintiff's first cause of action, entitled "Interference with Rights Granted by the FMLA," alleges that "[p]laintiff gave notice to her employer of her need to take FMLA leave" (Complaint at ¶ 30), but that Defendants "failed to provide her with the information and paperwork required to apply for such leave and denied her the right to take a leave of absence . . . ." (*id.* at ¶ 31). Plaintiff's second cause of action, entitled "Retaliation for Exercising Rights Granted by the FMLA," alleges that Defendants retaliated against plaintiff by terminating her within one month after she requested the paperwork to apply for FMLA leave.

24

### *The Interference Claim*

In moving for summary judgment with respect to plaintiff's first cause of action,

Defendants argue that plaintiff's interference claim fails for two reasons: "(1) Plaintiff was sent

paperwork by Gail Carmichael detailing her rights and responsibilities under the FMLA; and (2)

Defendants posted the FMLA policies and procedures in a conspicuous manner both on postings

in HSS's offices and in its employee handbook given to all employees, including Plaintiff."

Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants'

Memo") at 20.  In response, plaintiff argues (1) that there exists a genuine issue of material facts

regarding whether Carmichael actually mailed the paperwork and (2) that Defendants are

misconstruing the very nature of the first cause of action.

Plaintiff is correct in both respects.  With regard to the first argument, Defendants urge

this Court to credit Carmichael's testimony that plaintiff was sent the FMLA Notice, noting that

"[i]t is uncontroverted that . . . Carmichael emailed . . . Tserpelis on June 1, 2009 . . . , to obtain a

job description for Plaintiff's position . . . [and that] Carmichael ultimately sent a disability

benefits form to Plaintiff" (Defendants' Memo at 20).  Defendants acknowledge that "Plaintiff

claims that she was never sent nor did she ever receive the FMLA form," (*id.*), but argue that

"her contention is entirely untenable" and that it "defies all logic that Ms. Carmichael would send

information related to Plaintiff's disability benefits, however omit sending the FMLA forms as

well" (*id.*).

While this argument correctly notes that there is circumstantial evidence suggesting that

Carmichael mailed the FMLA Notice, it ignores the ample evidence to the contrary.  Plaintiff

does not merely "claim" that she never received the FMLA Notice, but testified to this fact

during her deposition (Voltaire Dep. at 145-46).  That testimony was corroborated by deposition

25

testimony from plaintiff's daughter, Denis, an attorney, who testified that she collected plaintiff's mail during plaintiff's hospitalization, and opened the mail with plaintiff in mid-June 2009 (Denis Dep. at 85, 111). Both Denis and plaintiff recalled receiving the disability form (*id.* at 107; Voltaire Dep. at 123), but testified that they never received a copy of the FMLA Notice (Denis Dep. at 82-83; Voltaire Dep. at 145-46).

Moreover, the uncontroverted evidence that plaintiff received the disability form does not logically mandate the conclusion that Carmichael mailed the FMLA form along with the disability form. Indeed, the cover letter from Carmichael to plaintiff dated June 1, 2009, refers solely to the disability forms (Ex. L to Paulose Dec.), and Carmichael herself cannot recall what she sent to plaintiff. Furthermore, although Carmichael testified that it was her practice to call the employee if the FMLA certification form was not returned within the time specified, Carmichael could not recall whether she had done so in plaintiff's case (Carmichael Dep. at 24) and could not find the folder on which she allegedly kept a record of the calls she placed to plaintiff (*id.* at 25).

Defendants' second argument seeks to analogize this action to cases that have rejected attempts to recover for an employer's failure to provide employees with adequate notice of their right under the FMLA. For example, Defendants cite to *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999), which expressly rejected the proposition that plaintiffs have an independent right to notice under the FMLA that would permit an employee to "sue the employer for failure to give notice even if that failure in no way affected the employee's leave, benefits, or reinstatement." Defendants also cite to district court cases which have disposed of claims alleging a failure to give notice on factual grounds. *See Genovese v.*

26

*Goodyear Tire & Rubber Co.*, No CV-04-4505 (SJF)(AKT), 2007 WL 2746917, at *7 (E.D.N.Y. Sept. 18, 2007) (holding that plaintiff did not establish that defendant interfered with his FMLA rights by failing to provide him with adequate notice of those rights because the undisputed evidence established that defendant adequately posted FMLA rights and procedures in its store, in a written policy given to all employees and store managers and on its intranet); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 430-431 (S.D.N.Y. 2004) (finding that plaintiff had notice of the defendant's FMLA policy because it appeared in the defendant's online employee handbook).

In response, plaintiff characterizes Defendants' second argument as a "red herring," stating that plaintiff is "not claiming lack of notice . . . [but] that she was never allowed to exercise the right provided by the notice." Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memo") at 21. In light of plaintiff's representation, which is entirely consistent with the language of plaintiff's second cause of action, this Court finds that the cases cited by Defendants are inapposite. Since Defendants' second argument is without merit and since there exists a genuine question of material fact regarding whether Carmichael ever mailed the FMLA Notice, summary judgment cannot be granted with respect to plaintiff's first cause of action.

### *The FMLA Retaliation Claim*

Defendants also seek summary judgment with respect to plaintiff's second cause of action, which advances a FMLA "retaliation" claim. As noted above, the Second Circuit held in *Potenza* that such retaliation claims are to be analyzed using the burden-shifting approach originally established by the Supreme Court in a Title VII case, *McDonnell Douglas Corp. v.*

27

*Green*, 411 U.S. 792, 802-04 (1973).  Under *McDonnell Douglas*, plaintiff bears the initial

burden of proving a prima facie case by a preponderance of the evidence.  In order to make out a

prima facie case of FMLA discrimination, a plaintiff must establish that:

> 1) he exercised rights protected under the FMLA; 2) he was
> qualified for his position; 3) he suffered an adverse employment
> action; and 4) the adverse employment action occurred under
> circumstances giving rise to an inference of retaliatory intent.

*Potenza*, 365 F.3d at 168.  If the plaintiff can do so, the burden of production then shifts to the

defendants, who must offer through the introduction of admissible evidence a non-retaliatory

reason for their actions.  If the defendants meet this burden of production, the plaintiff must then

"provide sufficient evidence from which a reasonable factfinder could conclude that the

[defendants'] stated explanation for firing [the plaintiff] was merely a pretext masking

impermissible retaliatory motives." *Sista*, 445 F.3d at 176 (bracketed material added).

   In this case, Defendants do not argue that plaintiff is unable to establish a prima facie

case.  Rather, Defendants argue that they have proffered a non-retaliatory explanation for

plaintiff's termination, and that plaintiff has not uncovered sufficient evidence from which a

reasonable factfinder could conclude that this explanation was pretextual.  In response, plaintiff

principally argues that, despite the evidence that HSS was in the process of "restructuring" the

Nursing Department, the only evidence that Tserpelis had decided to terminate plaintiff in mid-

April 2009 is "an entirely made up document" (Plaintiff's Memo at 9).  In reply, Defendants

argue (1) that plaintiff must do more than merely disprove Defendants' proffered reason for the

termination and (2) that plaintiff has ignored other evidence substantiating Tserpelis's claim that

she had decided to terminate plaintiff long before her illness.

28

Before analyzing the facts of this case, this Court must first address the legal issue raised by Defendants' reply. As Defendants correctly note, *McDonnell Douglas* requires a plaintiff to do more than prove that a defendants' proffered explanation for an adverse employment action is false. *See, e.g., Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222 n. 3 (2d Cir. 1997) ("[A] discrimination plaintiff may not succeed by proving only that a proffered explanation is false"); *Fields v. New York State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997) (plaintiff must prove both that the defendant's proffered reason was false, and that discrimination or retaliation was the real reason). The ultimate burden of persuasion is always on the plaintiff, who must demonstrate that the employer's action was prompted by an impermissible motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12 (1993) (citing *Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). However, the Supreme Court has held that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks*, 509 U.S. at 511. Under these circumstances, "[r]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination" or other impermissible motive. *Id.*

In this case, plaintiff is tacitly relying on *Hicks*, arguing that Defendants' non-retaliatory explanation for plaintiff's termination rests primarily on evidence fabricated by Tserpelis. Plaintiff essentially argues that there is enough evidence to create a "suspicion of mendacity" on the part of Tserpelis, and that a factfinder's disbelief of her explanation, coupled with the elements of the prima facie case, could justify a verdict for plaintiff. Although the Court is not

29

convinced that plaintiff's argument will succeed, it finds that there is sufficient evidence to place the issue before a jury.

First, although the parties have not discussed the issue of whether and how plaintiff can make out a prima facie case of FMLA retaliation, this Court assumes that plaintiff's prima facie case relies on proof of the temporal proximity between plaintiff's exercise of her FMLA rights and plaintiff's termination.  Indeed, plaintiff can demonstrate a close temporal proximity between plaintiff's request for FMLA leave and her termination.  By all accounts, Defendants first learned that plaintiff was in the hospital on May 26, 2009.  It is unclear precisely when Defendants first realized that plaintiff was eligible for FMLA.  Although Denis testified that she did not inquire about FMLA leave until the second week of June 2009, there is evidence that Carmichael may have been putting together a "package" concerning plaintiff's FMLA benefits as early as June 1, 2009.  However, even assuming that Defendants became aware of plaintiff's FMLA eligibility sometime during the last week of May 2009, the letter apprising plaintiff of her termination would have been drafted no more than one month thereafter.

Second, although Tserpelis claims that she decided to terminate plaintiff in mid-April 2009, there are reasons to doubt the veracity of Tserpelis's claim.  There is no evidence that Tserpelis orally informed anyone of her intention to terminate plaintiff until late June 2009, when she had Carmichael draft the termination letter.  Indeed, Tserpelis did not inform the nursing staff – including the two nurses with whom plaintiff worked – until July 22, 2009, and did not tell plaintiff herself when plaintiff called on June 30, 2009 – one day after Tserpelis allegedly signed the termination letter.

30

In addition, all of the documentary evidence that Tserpelis intended to terminate plaintiff before she became ill comes from Tserpelis herself. To be sure, there is considerable documentary evidence indicating that HSS was in the process of restructuring its Nursing Department in the first half of 2009. However, Tserpelis's monthly reports to Pappas frequently disclosed Tserpelis's intentions to terminate employees long before they were actually terminated. For example, Tserpelis disclosed in her January 2009 report that she intended to replace two nurses who were "consistently missing client visits and not conducting them in a timely manner" (Paulose Declaration, Ex. H, at D-188). However, one of these nurses – Adrienne Williams – still had not been terminated as of May 12, 2010, when Tserpelis was deposed (Tserpelis Dep. at 222, 227). Similarly, Tserpelis stated in her February 2009 report that she intended to replace Israel with an RN, who would assume the role of Head Nurse (Paulose Declaration, Ex. H, at D-192). Israel was still working at HSS when she was deposed in late May 2010. In light of this tendency to inform Pappas of her decisions to terminate employees long in advance of actually doing so, the lack of any reference to plaintiff or her position is conspicuous.

Moreover, the only documentary evidence which specifically refers to Tserpelis's plan to terminate plaintiff and which pre-dates plaintiff's illness are three memoranda from Tserpelis. The first two of these memos, dated February 11 and April 13, 2009, are – by Tserpelis's own admission – "recreations" (Tserpelis Dep. at 247-48). While Tserpelis testified that the third memo, dated May 11, 2009, is an "original" (*id.* at 250), this testimony is equivocal. Shortly before offering this testimony, Tserpelis stated that she was "not sure" if it was a recreation (*id.*

31

at 248), and shortly after offering this testimony Tserpelis began her answer to a question referring to the memo by stating, "*If* this is the original . . . " (*id.* at 251) (emphasis added).

The parties have not addressed the issue of whether these recreated documents could be admitted to prove the facts set forth therein. However, even if they were admissible, plaintiff would have ample basis for arguing that they were "entirely made up" and "manufactured" with an intent "to deceive" (Plaintiff's Opposition at 9-10). First, although the April 13, 2009, memo was sent to both Carmichael and Pappas, copies apparently could not be located in either of their files. The remaining two memos were ostensibly memos to "File," but were remarkably formal. Both were on letterhead and initialed by Tserpelis, and the May 11, 2009, memo provided not only the full name of the person creating it ("Callie Tserpelis") but her title as well ("Program Director"). Moreover, there was nothing on the recreated memos to suggest that they were only recreations, rather than original. Rather, the manner in which the documents were recreated appeared calculated to create the impression that the documents were, in fact, originals.

Even if the finder of fact were to find that Tserpelis printed the recreated documents on letterhead and initialed them in a good-faith effort to faithfully duplicate the originals, these facts would only serve to raise further questions. If the originals were placed on letterhead and hand-initialed, they must have existed in hard copy. Moreover, one would logically expect that anyone who took the care to create such elaborate memoranda would be equally careful in preserving them. Indeed, Tserpelis claimed that she retained the handwritten notes on which these memoranda were based in her "restructuring file" (Tserpelis Dep. at 245). Yet, she never explained why this file did not also contain the hard copies of the memoranda. In addition, while

32

Tserpelis testified that the electronic copy of the memos were lost when her computer "crashed,"
she made no effort to explain what happened to the hard copies of the memoranda.

Taken together, this evidence could lead a reasonable finder of fact to infer that Tserpelis
had deliberately manufactured evidence to suggest that she intended to terminate plaintiff in mid-
April 2009. This suspicion of mendacity, coupled with a disbelief of Tserpelis's stated reasons
for terminating plaintiff and the close temporal proximity between the onset of plaintiff's
hospitalization and her termination, could justify an inference of intentional discrimination.
*Hicks*, 509 U.S. at 511. Accordingly, this Court cannot conclude that the evidence adduced by
plaintiff is insufficient as a matter of law to satisfy plaintiff's burden under the third prong of
*McDonnell Douglas*. Defendants' motion for summary judgment on plaintiff's FMLA retaliation
claims is, therefore, denied.

### *Plaintiff's Discrimination Claims*

Defendants' arguments for summary judgment with respect to plaintiff's third and fourth
causes of action, alleging discrimination under the NYSHRL and NYCHRL, fail for the same
reasons articulated in the preceding section. Again, because Defendants' arguments assume that
plaintiff can make out a prima facie case of discrimination, the parties have not discussed the
evidence supporting the prima facie case. However, this Court notes that the temporal proximity
argument is much stronger in the discrimination context than in the FMLA retaliation context.
Tserpelis's own testimony establishes that she caused the termination letter to be sent to plaintiff
one working day after learning that plaintiff's condition was more serious than she previously
realized. It is uncontroverted that the letter informing plaintiff of her termination was dated
Monday, June 29, 2009. However, Tserpelis's testimony suggests that she was unaware that

33

plaintiff had suffered a collapsed lung until Friday, June 26, 2009, when she was informed of this fact by Israel (Tserpelis Dep. at 127). Tserpelis testified that she was "shocked to hear that [plaintiff] had a collapsed lung" (*id.*); that she considered it to be "important" information because she had not previously realized that plaintiff was "really that sick" (*id.* at 128), and that neither she nor Carmichael "knew what was going on with [plaintiff]" prior to that point (*id.*).

This Court is uncertain whether a collapsed lung, alone or in combination with plaintiff's other medical conditions, constitutes a disability for purposes of the NYSHRL or NYCHRL. However, Defendants have not expressly argued this point and this Court declines to address it *sua sponte*. Instead, this Court holds that the very close temporal proximity between Tserpelis's realization of the severity of plaintiff's condition and the mailing of the termination letter, coupled with a disbelief of Tserpelis's stated reasons for terminating plaintiff rooted in a suspicion of mendacity, could justify a finder of fact in inferring intentional discrimination. Accordingly, Defendants' motion for summary judgment with respect to plaintiff's third and fourth causes of action is also denied.

**The Joint Employer Doctrine**

Defendants fourth and final argument seeks to dismiss HANAC from this action on the ground that HANAC was not plaintiff's employer. In response, plaintiff argues that there is "sufficient evidence here to conclude that more likely than not HANAC and HSS are joint employers." Defendants' Memo at 22.

As noted above, portions of the FMLA apply only to employers. For example, 29 U.S.C. § 2615(a)(1), which is the basis for plaintiff's FMLA Interference claim, provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

exercise, any right provided under [the FMLA]." Similarly, those provisions of the NYSHRL and NYCHRL on which plaintiff's third and fourth causes of action are based prohibit certain discriminatory practices on the part of employers.

However, "[s]everal doctrines have been developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer." *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010). These doctrines include the "single employer" (or "single integrated employer") and the "joint employer" doctrines. *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 197 (2d Cir. 2005). "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise . . . .'" *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 137 (2d Cir. 1985) (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982)). In contrast, a "joint employer" relationship involves separate legal entities which "handle certain aspects of their employer-employee relationship jointly." *Id.*

The joint employer doctrine, on which plaintiff relies in this case, applies under both the FMLA and the local New York anti-discrimination statutes. *See* 29 C.F.R. § 825.106(a), *Barbosa*, 716 F. Supp. 2d at 216. The regulations applicable to the FMLA expressly provide that two or more businesses – even if separate and distinct entities with separate owners, managers, and facilities – may be joint employers under the FMLA if they jointly "exercise some control over the work or working conditions of the employee." The regulations specifically describe some instances in which "a joint employment relationship generally will be considered to exist." 29 C.F.R. § 825.106(a)(1)-(3). However, the regulations provide little guidance with respect to cases, like this one, which fall outside those categories, stating only that "[a] determination of

35

whether or not a joint employment relationship exists is not determined by the application of any

single criterion, but rather the entire relationship is to be viewed in its totality." 29 C.F.R.

§ 825.106(b)(1).

In contrast, some district courts in this Circuit have identified factors to be used in

determining whether two entities are "joint employers" for purposes of the NYSHRL.  For

example, in *Goyette v. DCA Advertising Inc.*, 830 F.Supp. 737 (S.D.N.Y. 1993), Judge Conboy

stated:

> In determining whether an entity may be considered an employer
> within the meaning of the Human Rights Law, the Court must
> analyze four elements: 1) whether the proposed employer had the
> power of the selection and engagement of the employee; 2)
> whether the proposed employer made the payment of salary or
> wages to the employee; 3) whether the proposed employer had the
> power of dismissal over the employee; and 4) whether the
> proposed employer had the power to control the employee's
> conduct.

830 F.Supp. at 746 (citing *State Division of Human Rights v. GTE Corp.*, 109 A.D.2d 1082, 487

N.Y.S.2d 234, 235 (4th Dept.1985)).  In weighing these factors, Judge Conboy cited to a New

York Court of Appeals case – *In re Villa Maria Institute of Music v. Ross*, 54 N.Y.2d 691, 442

N.Y.S.2d 972, 973 (1981) – for the proposition that the fourth of these factors was "the most

essential factor in this analysis."  *Id.*  Judge Conboy's analysis was followed by Judge Bartels in

*Alie v. NYNEX Corp.*, 158 F.R.D. 239, 246 (E.D.N.Y. 1994).

Since *Goyette*, *Alie*, and the state court cases on which they relied did not distinguish

between the single employer and joint employer theories, it is unclear whether this factor analysis

was intended to apply to both doctrines.  However, both parties' briefs cite to these factors.

Defendants' Memo at 23; Plaintiff's Memo at 22, n. 7.  Moreover, despite the fact that neither

*Goyette* nor *Alie* involved the NYCHRL, both parties' submissions state that these factors are

36

applicable to both NYSHRL and NYCHRL cases. *Id.* Accordingly, this Court will utilize these factors in determining whether HANAC and HSS are joint employers.

After carefully reviewing the facts of this case, this Court concludes that the evidence relating to these factors is, at best, equivocal. First, although Tserpelis testified that it was Morgan-Parker's decision to hire plaintiff and the other LPNs, both plaintiff and Israel testified that they were interviewed not only by Morgan-Parker and Tserpelis, but also by Zacharine Pappas – the Associate Executive Director of HANAC. Voltaire Dep. at 20; Israel Dep. at 9-11. It is unclear precisely what role Pappas played in hiring plaintiff. However, it is undisputed that Pappas hired Tserpelis; that Pappas exercised some oversight over HSS; and that Tserpelis sent Pappas monthly reports detailing prospective personnel moves. Indeed, before Tserpelis hired plaintiff, Tserpelis sent Pappas an e-mail stating, "I would like to hire Maryse Voltaire (LPN) . . . to do assessments, handling of complaints etc. in Brooklyn as we discussed." Paulose Declaration, Ex. S. Although Tserpelis claimed that the decision to hire plaintiff was made at HSS, Tserpelis conceded that she had to inform Pappas of all her hires and "normally . . . put it in writing so . . . she can say yes or no or whatever" (Tserpelis Dep. at 70-71).

Second, although plaintiff was nominally paid by HSS, it is unclear what role HANAC played in setting the wages at HSS. In her email proposing that plaintiff be hired, Tserpelis stated, "I would offer her $45,000." Paulose Declaration, Ex. S. Tserpelis claimed that she was only "verifying to make sure we have the money and line in the budget for the position" (Tserpelis Dep. at 70), rather than seeking permission to hire plaintiff at that rate. However, the very fact that Tserpelis needed to contact Pappas, rather than an employee of HSS, implies that HANAC at least shared responsibility for the payroll at HSS.

37

Third, it is unclear what power Pappas exercised over Tserpelis's decisions to terminate HSS personnel. However, as noted above, it is undisputed that Tserpelis was required to send Pappas the monthly reports, which detailed prospective terminations, and that Pappas exercised some oversight over HSS. These facts suggest that HANAC may have had some control over whether employees were dismissed or retained and, therefore, had some power to control the conduct of HSS employees.

In sum, it is unclear from the evidence adduced by the parties whether HANAC had power over the hiring and firing of HSS employees, had any role in the payment of salary or wages to HSS employees or had the power to control the conduct of HSS employees. Accordingly, there remains a genuine issue of material fact concerning whether HSS and HANAC were joint employers, and Defendants' motion to dismiss HANAC from this action is denied.

### *CONCLUSION*

For the reasons set forth above, Defendants' motions for summary judgment are denied in their entirety. Pursuant to section IV of this Court's Individual Motion Practice & Rules, the parties shall contact the Court to set a date for a pre-trial scheduling conference within thirty (30) days of the date of this Memorandum and Order.

**SO ORDERED.**

/ ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2011
       Brooklyn, New York

38